## PENSACOLA SHIPPING CO. v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.

(Circuit Court of Appeals, Fifth Circuit. January 25, 1922.)

No. 3772.

1. **Appeal and error** ⟨⟩**926(2)—Treatment by trial court of instrument as in evidence presumed acquiesced in by appellant, in absence of objection.**

   Where there was nothing in the record to indicate that appellant raised any objection to the trial court's action in treating an instrument, a copy of which was attached as an exhibit to libelee's answer, as evidence in the case, it was to be inferred that such treatment was acquiesced in by appellant.

2. **Shipping** ⟨⟩**50—Maritime liens** ⟨⟩**30—No lien on ship or claim against owner for coal and supplies furnished with notice of charter restrictions.**

   Where charter party required the charterer to provide and pay for coal and certain supplies, a shipping company by furnishing and paying for such coal and supplies for the ship, did not acquire a lien on the ship or a claim against its owner, under Act June 23, 1910, § 3 (Comp. St. § 7785), where the company, not knowing of the terms of the charter party, made no effort to secure information as to its terms, although in com-

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

munication with the charterer for several weeks before the vessel's arrival at the port for supplies.

**3. Subrogation ⟨=⟩26—Volunteer has no right.**

. Where shipping company, by payment of bills for coal, etc., furnished a vessel, and approved by its master, acquired no lien on the vessel or claim against the owner, under Act June 23, 1910, § 3 (Comp. St. § 7785), because of the failure to exercise reasonable diligence to ascertain the terms of the charter party, which required the charterer to provide and pay for such supplies, such payments did not give the shipping company the right by subrogation to enforce the liens in favor of the actual furnishers, who were not shown to have been chargeable with notice of the terms of the charter party, for, so far as the vessel and its owner were concerned, the shipping company was a mere volunteer in making. the payments, and subrogation does not arise in favor of a volunteer paying another's debt, but the debt is thereby extinguished.

**4. Estoppel ⟨=⟩78(4)—Vessel owner held not estopped to deny liability for supplies furnished charterer by directing account be submitted for audit.**

Where, after defendant vessel owner had explicitly denied responsibility . for disbursements made by plaintiff shipping company for the charterer's account, it was not estopped to deny such responsibility by telegram directing that plaintiff's disbursements be submitted to defendant's office for audit, where the telegram added, "We return them to you for transmittal to" charterer, "latter should then reimburse you immediately."

Appeal from the District Court of the United States for the Northern District of Florida; Wm. B. Sheppard, Judge.

Libel by the Pensacola Shipping Company against the United States Shipping Board Emergency Fleet Corporation. From a decree for libelee, libelant appeals. Affirmed.

W. H. Watson and S. Pasco, Jr., both of Pensacola, Fla., for appellant.

John L. Neeley, U. S. Atty., of Pensacola, Fla., for appellee.

Before WALKER, BRYAN, and KING, Circuit Judges.

WALKER, Circuit Judge. This was a libel by the appellant, Pensacola Shipping Company, against the appellee, United States Shipping Board Emergency Fleet Corporation, to recover the amount of payments made by the appellant for coal and other necessaries furnished to the steamship Belair, a vessel belonging to the appellee, between the date of its arrival at the port of Pensacola on January 10, 1920, and its departure therefrom on January 28, 1920. The evidence adduced showed that the amounts claimed were paid by the appellant under the following circumstances:

On December 22, 1919, a New York firm of ship agents sent to the appellant at Pensacola a telegram, of which, omitting the address and signature, the following is a copy:

"Dale Universal have Belair due Pensacola 'first Jany. to load lumber for Plate can arrange agency for you fifty dollars want quotation five hundred bunkers wire whether agency acceptable you stop they intimate possibly have several sailings monthly."

On the next day the appellant replied to that telegram by one stating, "Dale Universal agency acceptable at fifty dollars," and quoting

price of bunker coal. By a letter dated December 24, 1919, the Dale Universal Line, through its agents, Dale Forwarding Corporation, appointed the appellant as its agent for the Belair while at Pensacola. A letter of instructions to the appellant, dated December 27th, advised it that its principal was a time charterer of the vessel, and contained the following:

"Regarding disbursements, you will kindly send us your full accounts immediately upon completion of vessel and we will then reimburse you."

The appellant handled the agency according to the charterer's instructions. The disbursements, except a small amount for telegrams, were made by paying bills for the supplies, etc., rendered against the vessel itself and approved by its master. Soon after the vessel sailed from Pensacola the appellant sent a statement of the disbursements it had made to the charterer's New York agent, and requested payment thereof. The account was returned with a letter directing that it be sent to the appellee for payment. In response to a letter from the appellant on the subject, the appellee declined to pay, denying liability for disbursements for which the ship was not responsible under the terms of the charter party. What was alleged to be a copy of that instrument was made an exhibit to the appellee's answer.

[1] In argument attention was called to the fact that the record does not show that the exhibit to the appellee's answer was proved to be a copy of the charter party under which the Belair was being operated at the time the supplies in question were furnished. Language used in the memorandum opinion rendered by the trial judge plainly indicates that the court treated that instrument as before it for consideration as evidence in the case, reference being made to the provision of the charter party requiring the charterers to pay for coal, etc., furnished to the ship. There being nothing in the record to indicate that the appellant raised any objection to this action of the court, it is to be inferred that the court's treatment of that instrument as evidence in the case was acquiesced in by the appellant.

[2] The charter party contained a provision requiring the charterer to provide and pay for coal and other things which were paid for by the appellant. That provision, under the proviso contained in section 3 of the Act of June 23, 1910 (36 Stat. 605; Comp. Stat. § 7785), prevented the furnishing of the coal and other necessaries from having the effect of giving rise to a lien on the ship, or a claim against its owner, therefor, if the furnisher knew, or by the exercise of reasonable diligence could have ascertained, the terms of the charter party. The evidence showed that, when the coal and other necessaries were furnished and paid for, the appellant did not know of the terms of the charter party. It affirmatively showed that the appellant acted under the agency it accepted, and made the payments in question without making any effort to get information as to the terms of the charter party, of the existence, of which it was apprized as above stated; it being disclosed that, though the appellant was in communication with the charterer several weeks before the vessel's arrival at Pensacola, it did not ask for a copy of the charter party, or for information as to its terms, until, in a letter writ-

ten to the appellee after the latter had denied responsibility and refused payment, it requested to be furnished a copy of the charter party, or of the form used in making the contract between the appellee and the charterer. It is apparent that the appellant exercised no diligence at all to ascertain the terms of the charter party before making payments in pursuance of the charterer's directions.

The evidence as to the circumstances under which the appellant was put on inquiry as to the terms of the time charter party referred to in a letter to it from its principal, the charterer, persuasively calls for the conclusion that, if the appellant had exercised reasonable diligence, it would have ascertained, before it made the payments in question, that both its principal, the charterer, and the master, were without authority to bind the vessel or its owner therefor. As above stated, the appellant was in direct communication with the charterer during a considerable time before it was called on to make payments in pursuance of the charterer's instructions and on the faith of the latter's promise of reimbursement. Under the circumstances the agent reasonably could have expected that an inquiry of its principal would elicit information as to the terms of the charter party bearing upon the question of the right or lack of right to bind the vessel for supplies or other necessaries furnished or paid for at the instance of the principal. The agent was entitled to be informed by the principal in that regard, as no liability of the ship or its owner would result from payments made for supplies required to be furnished and paid for by the principal, the charterer. If information as to the terms of the charter party had been withheld after a timely request therefor, it is not to be supposed that the agent would have made the disbursement pursuant to the principal's instructions, unless the agent intended to look to the principal alone for reimbursement, or was influenced by the mistaken belief that the vessel would be responsible for the value of the supplies and other necessaries so furnished, whether by the terms of the charter party the charterer was or was not required to provide and pay therefor.

The fact that the appellant was in touch with the charterer a considerable time before the payments in question were made distinguishes the instant case from the case of W. G. Coyle & Co. v. North America Steamship Corporation (C. C. A.) 262 Fed. 250. In the cited case there was no evidence tending to prove that any one who was to be presumed to be able to furnish information as to the terms of the charter party was within reach of the libelant at or prior to the time the supplies were furnished. We think that the evidence in the instant case warrants the conclusion that the appellant's ignorance of the terms of the charter party is to be attributed to its negligent failure to try to get that information before it paid for the coal, etc. It is disclosed that appellant did not avail itself of accessible sources of information in that regard, because of the mistaken belief that the vessel would be bound for the amounts so disbursed, whatever might be the terms of the charter party. It is plain that the making, long after the appellant paid for the coal, etc., of the request by the appellant of the appellee for information as to the terms of the charter, was not the

exercise of the reasonable diligence required by the statute. As the appellant's failure to be informed of the terms of the charter party before making the payments in question, for which neither the charterer nor the master had authority to bind the vessel or its owner, was due to failure to exercise reasonable diligence, the making of such payments did not give rise to a liability of the vessel or its owner to reimburse the charterer or its agent therefor. The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710; The Kate, 164 U. S. 470, 17 Sup. Ct. 135, 41 L. Ed. 512; Curacao Trading Co. v. Bjorge (C. C. A.) 263 Fed. 693.

[3] It was contended in argument that a result of the appellant's payment of the bills for coal, etc., approved by the master, was to give the appellant by subrogation the right to enforce the liens in favor of the actual furnishers, who were not shown to have been chargeable with notice of the terms of the charter party. In making those payments the appellant acted as the charterer's agent, in pursuance of instructions given by the latter, and on the faith of the latter's promise of reimbursement. So far as the vessel and its owner were concerned, the appellant was a mere volunteer in making those payments. The equitable right of subrogation does not exist in favor of a mere volunteer, who pays a debt of one person to another. Extinguishment of the debt results from the payment of it by a volunteer. Prairie State Bank v. United States, 164 U. S. 227, 231, 17 Sup. Ct. 142, 41 L. Ed. 412; 37 Cyc. 375. When the appellant made the payments in question, it was under no obligation, except that incident to its agency for the charterer. The charterer or his agent cannot acquire a right to hold a ship or its owner responsible by paying for supplies which the charter party requires the charterer to furnish and pay for. Minturn v. Maynard, 17 How. 477, 15 L. Ed. 235.

[4] It is insisted that the appellee estopped itself to deny its responsibility for the disbursements in question by directing the appellant to submit the account against the Belair to the appellee for audit. After the appellee had explicitly denied responsibility for disbursements made by the appellant for the account of the charterer, the request that the account be submitted for audit was made in a telegram of which, omitting the address and signature, the following is a copy:

"Refer your letter fourteenth Belair Accounts Stop Pensacola disbursements should be submitted this office for audit we return them to you for transmittal to Dale Universal Line latter should then reimburse you immediately."

The appellee's previous letter, which contained the above-mentioned denial of responsibility, contained also the following:

"You did not, however, transmit copies of bills upon which I could determine what is chargeable against the Shipping Board and what is chargeable against the charterers. Upon receipt of these bills I shall be glad to issue necessary instructions for our managers to pay such bills as were disbursed by you for account of the owners."

The charter party contained the following provision:

"That the owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the captain, officers, engineers, firemen and crew; shall pay for the insurance of the vessel; also for all the

cabin, deck, engine room, and other necessary stores; and shall exercise due diligence to maintain her in a thoroughly efficient state in hull and machinery for and during the service."

An examination of the account by the appellee was appropriate to enable it to ascertain if payments made by the appellant covered things which the owner was required by the charter party to provide and pay for. The appellee's request that the accounts be submitted to it for audit was made under circumstances which negative the conclusion that the appellant was influenced thereby to refrain from enforcing its claim against the charterer, or otherwise to change its position. A reasonable person, situated as the appellant was, could not have been misled as to the significance of the request that the account be submitted to the appellee for audit, as, when that request was made, it had been unequivocally disclosed that the appellee refused to be responsible for the appellant's outlay, so far as it was for what the charter party required the charterer to furnish and pay for, but was willing to make reimbursement for so much, if any, of the outlay as was for things which the charter party required the owner to furnish and pay for. There is no merit in the contention that the appellee estopped itself to deny or defeat the liability asserted by the libel.

The conclusion is that, under the facts disclosed, the claim asserted by the libel was not maintainable. It follows that the decree appealed from should be affirmed; and it is so ordered

Affirmed.